NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN HYLAND, | : |
| Plaintiff, | : Civil No. 06-6155 (AET) |
| v. | : **MEMORANDUM AND ORDER** |
| AMERICAN GENERAL LIFE COMPANIES, LLC, | : |
| Defendant. | : |

THOMPSON, U.S.D.J.

INTRODUCTION

This matter is before the Court on Defendant American General Life Companies, LLC ("American General") Motion for Summary Judgment. The Court has decided this Motion based upon the submissions of the parties, without oral argument, pursuant to Fed. R. Civ. P. 78. For the reasons stated below, Defendant's Motion is granted.

BACKGROUND

Plaintiff John Hyland filed this action against Defendant American General, alleging that his employment with Defendant was terminated because of unlawful age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq, and New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 et seq. ("LAD"). The following facts are taken from the parties' Combined Local Rule 56.1 Statement of Material

Facts, submitted by Defendant with its Reply.[1]

After earning a law degree in 1989, Plaintiff became employed as an attorney for Defendant. From 1989 to 2003, Plaintiff served as Director of Investigations, and his job duties were "largely claims related," which entailed directing investigations of claims made against Defendant, and reviewing claims to determine whether they were fraudulent. (Spang Cert., Ex. 1 (Hyland Dep.) 8-11.) Plaintiff also was involved in contract discussions, dealings with insurance agents, employer benefit plans, product development, reviewing new business proposals and dealings, reviewing reinsurance agreements, and providing advice to the litigation department on settlement issues. Plaintiff acted as the head of the Special Investigations Unit ("SIU") for life and disability claims. (Id. at 8-12, 15.)

In 2003, Plaintiff's title became Senior Attorney, and he was assigned to work in the now-centralized Legal and Compliance Department under Kenneth Walma. (Id. at 12-13, 30-31.) Plaintiff reviewed claims and contracts, and was involved with the initial development of insurance products. The attorneys in the department, including Plaintiff, worked on different tasks for different areas of Defendant's business. (Pl.'s Opp'n Ex. A (Hyland Dep.) 19-20.) Plaintiff continued to be in charge of the SIU. (Spang Cert., Ex. 1 at 24.) Plaintiff's salary as Senior Attorney was $95,850 per year. (Isaacs Decl., ¶ 4.)

---

[1] The Court notes that Plaintiff's Counter Statement to Defendant's Rule 56.1 Statement includes admissions and denials of Defendant's facts, but does not include additional material facts. Further, the Court considers those of Defendant's statements that Plaintiff has denied without citation to the record, or denied without creating a genuine dispute as to material facts, to be admitted. See Kautz v. Met-Pro Corp., 412 F.3d 463, 475 (3d Cir. 2005) (lack of personal knowledge or memory does not create a factual dispute); Black Car Assistance Corp. v. State of N.J., 351 F. Supp. 2d 284, 286-87 (D.N.J. 2004) (requiring non-movant to cite concrete evidence in the record to defeat summary judgment); Longoria v. New Jersey, 168 F. Supp. 2d 308, 312 n.1 (D.N.J. 2001); Hill v. Algor, 85 F. Supp. 2d 391, 408 n.26 (D.N.J. 2000).

In October 2004, Defendant hired Marc Herling to be the new head of the Legal and Compliance department. As a result, Mr. Herling became Plaintiff's direct supervisor. (Spang Cert., Ex. 1 at 35.) Soon after commencing employment, Mr. Herling met with his direct reports and subordinates in order to learn about their job duties, and to obtain feedback about the department. (Spang Cert., Ex. 2 (Herling Dep.) 7; Herling Decl., ¶ 3.) Mr. Herling also met with leaders of five business lines that the Legal and Compliance department serviced, so that he could learn about business objectives and solicit comments about the performance of the department. (Spang Cert., Ex. 2 at 7, 9; Herling Decl., ¶ 3.) The business leaders told Mr. Herling that they did not find that the Legal and Compliance department understood their business needs and objectives, a criticism that was echoed by Mr. Herling's subordinates. (Herling Decl., ¶¶ 4-9.)

The business leaders also expressed complaints about Plaintiff, stating that they did not believe Plaintiff understood their businesses, and that he appeared disorganized. (Herling Decl., ¶¶ 4-6, 10.) Mr. Herling subsequently reviewed Plaintiff's work product. On November 29, 2004, Mr. Herling provided Plaintiff with a counseling memorandum that summarized the business leaders' criticisms of Plaintiff, and identified several examples of Plaintiff's work product where Mr. Herling believed that Plaintiff "[did] not pay attention to detail and [did] not take projects to completion." (Spang Cert., Ex. L (Nov. 29, 2004 Memorandum) 2.) In either late November or early December 2004, Mr. Herling held a staff meeting in which he criticized the department for being "an operation that only worked from 9:00 until 5:00 . . . [and] [t]hat they were there simply to get their pay checks." (Spang Cert., Ex. 1 at 49.) Mr. Herling then asked Plaintiff to respond to his criticisms, stating, "[L]et's hear from the old man of the operation."

3

(Id. at 49, 51.)

In March 2005, Eileen Donahue, who was responsible for contracts and agreements for the Third Party Administrators and General Agents business line, in discussions with Mr. Herling, questioned whether Plaintiff adequately reviewed his work. (Herling Decl., ¶ 11.) Around this time, Mr. Herling gave Plaintiff a formal performance review, in which he rated Plaintiff a 4, on a scale of 1 to 5, with 5 representing the worst score. (Spang Cert., Ex. B (Performance Appraisal.)) Mr. Herling indicated that Plaintiff had not demonstrated any improvement since receiving the November 2004 counseling memorandum, and continued to exhibit a lack of attention to detail. Further, Mr. Herling criticized Plaintiff's management skills with respect to the SIU. (Id. at 5, 6, 8.)

In July 2005, two SIU investigators resigned from their positions, and cited Plaintiff's poor managerial skills as the reason motivating their departures. (Spang Cert., Ex. M (Herling's notes of interview with Ferlita and Jones); id., Ex. N (Jones's exit interview); id., Ex. O (Ferlita's exit interview.)) Shortly after the employees' resignations, Mr. Herling met with Karen Isaacs, the Vice President of Human Resources, to discuss Plaintiff's performance. Ms. Isaacs had received similar complaints about Plaintiff from some of the business leaders. (Spang Cert., Ex. 3 (Isaacs Dep.) 10.) Ms. Isaacs told Mr. Herling that she was not interested in reassigning an employee who was not performing in accordance with expectations to a different department. (Id. at 9.) Ms. Isaacs referred Mr. Herling to Eileen Hampton, who handled performance management issues within the Human Resources department. (Id., 14, 20, 25.) Ms. Hampton began work on a counseling report intended to serve as a framework for a performance management plan for Plaintiff, while Mr. Herling drafted a memorandum that chronicled

Plaintiff's managerial and performance issues since Plaintiff's formal review in March 2005.  (Id. at 14; Spang Cert., Ex. P (July 21, 2005 final warning memorandum.))  However, Ms. Hampton's and Mr. Herling's documents were not finalized before Mr. Herling's reorganization plan for the Legal and Compliance department took effect, and Plaintiff's position was terminated in August 2005.

Mr. Herling began drafting a plan to reorganize the Legal and Compliance department in early 2005, following his meetings with the business leaders.  (Herling Decl., ¶ 15.)  His reorganization plan sought to structure the department so that attorneys would be responsible for a variety of functions within the same business line, thereby fostering contact and communication between an attorney and a business line.  (Herling Decl., ¶ 15.)  Ms. Isaacs reviewed the reorganization plan with the business president, James Weakley, and with Becky Campbell, the Executive Vice President of Human Resources.  (Spang Cert., Ex. 3 at 16-17.)  On August 9, 2005, Mr. Herling and Ms. Isaacs informed Plaintiff that his position had been eliminated because of the reorganization.  (Isaacs Decl., ¶ 2.)  Plaintiff was 56 years old at the time of the termination.  (Second Am. Compl., ¶ 30.)

Plaintiff's job responsibilities were distributed among a number of employees.  Robert Starkey, a 72 year old paralegal, assumed responsibility for subpoenas, liens, and other court filings that were served on Defendant.  Richard Zuckerman, Mary Donoghue, and William Woods, ages 63, 46, and 53, respectively, became responsible for providing legal advice to the Claims and Policy Service departments on behalf of the business lines for which they were responsible.  LizBeth DiGiovanni, age 33, who worked in Compliance, took over the management of the SIU.  The Compliance department, located in Houston, Texas, became

responsible for responding to complaints issued by state insurance regulators. (Herling Decl., ¶ 20; Isaacs Decl., ¶ 3.)

In addition, a new Associate General Counsel position was created for the Employer Benefits and Worksite business lines, to be responsible for legal matters related to the business line, and to manage litigation and product development, and to supervise Mr. Woods. (Pl.'s Opp'n Ex. A at Ex. 5 (job posting); Herling Decl., ¶ 21.) Tim Bolden, age 47, was hired to this position following a recommendation by the head of the Employer Benefits and Worksite business lines. (Spang Cert., Ex. 3 at 22-23; Herling Decl., ¶ 21.) Mr. Bolden had experience supervising attorneys, and approximately 23 years of legal experience, including experience with employer benefits law. (Herling Decl., ¶ 21.) Mr. Bolden's salary was $150,000 per year. (Isaacs Decl., ¶ 4.)

The number of employees in Mr. Herling's department remained the same after the reorganization was effected. (Isaacs Supp. Decl., ¶¶ 9, 10.)

On December 21, 2006, Plaintiff filed this action, and later filed a Second Amended Complaint, alleging two counts of age discrimination pursuant to the ADEA and LAD. Defendant now moves for summary judgment.

## APPLICABLE LAW

A.     Standard of Review

Summary judgment is appropriate if, on the record, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000). In deciding whether summary judgment should be granted, the

Court considers "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," and construes all facts and inferences in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); see also Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). To survive a motion for summary judgment, a plaintiff cannot rely merely on the unsupported allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

B.      Age Discrimination Claims

The ADEA states that, "it is unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA discrimination claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). First, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination by demonstrating that: (1) he is a member of a protected class, i.e., that he is over forty; (2) he is qualified for the position; (3) he suffered an adverse employment decision; and (4) he was ultimately replaced by someone sufficiently younger to permit an inference of age discrimination. Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001). When a plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant employer "to articulate some legitimate nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. The burden then shifts back to the plaintiff to demonstrate that the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

"Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision. <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 545 (3d Cir. 1992) (analyzing claim under Title VII of the Civil Rights Act of 1964 ("Title VII")); see <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (applying Title VII framework to ADEA claims).

Age discrimination claims brought under LAD are governed under the same framework as those brought under the ADEA. <u>Lawrence v. Nat'l Westminster Bank New Jersey</u>, 98 F.3d 61, 65 (3d Cir. 1996).

## DISCUSSION

The parties do not dispute the first three prongs of Plaintiff's *prima facie* case. Instead, their dispute focuses on whether Plaintiff can demonstrate that he was replaced by someone sufficiently younger than he, so as to give rise to an inference of unlawful discrimination. Defendant argues that Plaintiff is unable to establish a *prima facie* case of age discrimination, because he cannot demonstrate that Mr. Bolden replaced him, and because his job responsibilities were allocated among a number of people, who were both younger and older than Plaintiff. Plaintiff argues that Mr. Bolden, who is approximately nine years younger than Plaintiff, replaced him, and that this is sufficient to establish his *prima facie* case. Moreover, Plaintiff contends that the reorganization was actually a reduction-in-force, and, that a *prima facie* case is met because Defendant retained younger employees, while terminating Plaintiff's position.

The Court finds that no reasonable fact-finder would conclude that Mr. Bolden replaced

Plaintiff.  As Mr. Herling testified in his deposition, the reorganization plan created a new Associate General Counsel to be responsible for legal matters relating to the Employer Benefits and Worksites business lines.  In this capacity, Mr. Bolden managed litigation for the business lines, and supervised Mr. Woods, an attorney who was assigned to the business lines following the reorganization.  Plaintiff's assertion that he occasionally managed litigation during his employment with Defendant, and had interaction with Defendant's outside counsel (Hyland Aff., ¶ 2), does not create a triable dispute of fact with respect to Mr. Bolden's job responsibilities.  Mr. Bolden's responsibilities did not include managing the SIU, responding to state regulatory complaints, or handling subpoenas, liens, and other court filings that were served upon Defendant, which were within the scope of Plaintiff's job duties.  Moreover, Mr. Bolden's yearly salary was $150,000, while Plaintiff earned $95,850 per year, the disparity giving rise to an inference that the positions were sufficiently different such that a reasonable fact-finder may conclude that Mr. Bolden was not hired to replace Plaintiff, but instead was hired for a different position.  Plaintiff relies on an October 25, 2005 email written by Ms. Isaacs that refers to Mr. Bolden's position as a "restructured replacement position" (Pl.'s Opp'n Ex. E) as evidence that Mr. Bolden was hired to replace Plaintiff.  However, the Court does not find that this memorandum's reference to a replacement position is sufficient to create a genuine issue of material fact with respect to Mr. Bolden's hiring.

Further, the Court finds that the redistribution of Plaintiff's job responsibilities among a number of people of varying ages does not give rise to an inference of age discrimination.  See Swider v. Ha-Lo Indus., Inc., 134 F. Supp. 2d 607, 626 (D.N.J. 2001) (finding no inference of discrimination where only evidence was plaintiff's age at time of termination, and the fact that he

was replaced by individuals both younger and older than he).  Here, Plaintiff's job responsibilities were reassigned to 72-year old Robert Starkey, 63-year old Robert Zuckerman, 53-year old William Woods, Mr. Bolden, 46-year old Mary Donoghue, 46-year old Mr. Herling, and 33-year old Ms. DiGiovanni.  Mr. Herling did not know the names or ages of the Compliance department employees in Houston, Texas, who assumed responsibility for responding to state regulatory complaints (Herling Decl., ¶ 20), and, therefore, this cannot give rise to an inference of age discrimination.  See Sarullo v. United States Postal Serv., 352 F.3d 789, 799 (3d Cir. 2003) (holding that age discrimination cannot be inferred when there is no evidence that decisionmaker knew plaintiff's age).

      The only other evidence of age discrimination in the record on which Plaintiff relies to establish a *prima facie* case is Mr. Herling's statement, made during a staff meeting in November 2004, that Plaintiff was "the old man of the operation."  The Court does not find that one stray remark, made approximately ten months before Plaintiff's position was terminated, supports an inference that Plaintiff's termination resulted from age discrimination.

      Accordingly, because the Court finds that Plaintiff has not established a *prima facie* case, the Court grants Defendant's motion for summary judgment on both counts of Plaintiff's Complaint.

## CONCLUSION

      For the foregoing reasons, and for good cause shown,

      IT IS on this 12th day of September, 2008,

      ORDERED that Defendant American General Life Companies, LLC's Motion for Summary Judgment [24] is GRANTED; and it is further

ORDERED that this case is CLOSED.


    s/ Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.